**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DRUMMOND COMPANY, INC. and DRUMMOND LTD., <br><br>        Petitioners, <br><br> v. <br><br> VICE MEDIA LLC, <br><br>        Respondent. | CASE NO.: _____ <br><br><br> CASE IN OTHER COURT: <br> Case No. 2:15-cv-00506-RDP (N.D. Ala.) |

## DRUMMOND COMPANY, INC. AND DRUMMOND LTD.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL OR, ALTERNATIVELY, MOTION TO TRANSFER

John Murphy, Esq.
John Murphy & Associates, P.C.
171 Madison Ave., Suite 305
New York, NY 10016
T:  (646) 862-2012
E:  jmurphy@johnmurphylaw.com

*Attorneys for Petitioners Drummond
Company, Inc. and Drummond Ltd.*

# Table of Contents

**Table of Authorities** ..................................................................................... iv

**Introduction and Background Facts** ...................................................... 1

    Drummond Company, Inc. and Drummond Ltd. ............................................. 1

    Terry Collingsworth .............................................................................................. 2

    Jaime Blanco ......................................................................................................... 3

    Juan Carlos Rojas ............................................................................................... 10

    Drummond's Defamation and RICO Cases ..................................................... 11

    VICE's Podcast ................................................................................................... 14

**Legal Argument** ................................................................................................. 16

I.     THE LEGAL FRAMEWORK OF THE JOURNALISTS' QUALIFIED
        PRIVILEGE ................................................................................................... 16

II.    THE AUDIO RECORDINGS ARE DISCOVERABLE. ....................................... 18

    A.  The recordings are not reasonably available for any other source. ........... 18

    B.  The recordings are of likely relevance to multiple, significant issues in this
        case. ......................................................................................................... 19

        i.      The Defendants' have a stated goal and proven record of
              exploiting the media to further their fraudulent campaign,
              thereby damaging Drummond's business and reputation. ........ 19

        ii.     The interviewees' representations about the existence, scope,
              nature, and purpose of witness payments are directly relevant a
              critical issue in this case. ......................................................... 21

III.   VICE'S UNDUE BURDEN OBJECTION IS MERITLESS IN LIGHT OF THE
        NARROW SCOPE OF THIS MOTION TO COMPEL. .......................................... 23

IV.   DRUMMOND TIMELY ISSUED AND SERVED THE SUBPOENA ON VICE. ...... 24

V.    ALTERNATIVELY, THIS MISCELLANEOUS PROCEEDING SHOULD BE
      TRANSFERRED TO THE NORTHERN DISTRICT OF ALABAMA. ..................... 24

Conclusion ................................................................................................. 26

Certificate of Service ............................................................................... 27

# Table of Authorities

**Cases**                                                              **Page(s)**

*Baloco v. Drummond Company, Inc.*,
    767 F.3d 1229 (11th Cir. 2014), *cert. denied*, 136 S. Ct. 410 (2015)..................2

*Breaking Media, Inc. v. Jowers*,
    91 Misc. 194 (KPF), 2021 WL 1299108 (S.D.N.Y. Apr. 7, 2021) ....................16

*Chevron Corp. v. Berlinger*,
    629 F.3d 297 (2d Cir. 2011) ............................................................................16

*Doe, et al. v. Drummond Company, Inc., et al.*,
    782 F.3d 576 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016)................3

*Drummond Company, Inc. v. Conrad & Scherer, LLP*,
    885 F.3d 1324 (11th Cir. 2018).................................................................12 n.5

*Drummond Company, Inc. v. Terrence P. Collingsworth, et al.*,
    2:11-cv-003695-RDP (N.D. Ala.) .....................................................................11

*Estate of Klieman v. Palestinian Authority*,
    293 F.R.D. 235 (D.D. C. 2013) ..................................................................17 n.8

*Gonzales v. Nat'l Broad. Co.*,
    194 F.3d 29 (2d Cir. 1999) ....................................................... 15, 16, 17, 18, 19

*Marisol Melo Penaloza, et al. v. Drummond Company, Inc., et al.*,
    2:13-cv-00393-RDP (N.D. Ala.)..........................................................................3

*Romero v. Drummond Co., Inc.*,
    552 F.3d 1303 (11th Cir. 2008)..........................................................................2

*SBA Communications Corp. v. Fractus, S.A.*,
    19 Misc. 130 (ER), 2019 WL 4879333 (S.D.N.Y. Oct. 3, 2019) .......................25

*Schoolcraft v. City of New York*,
    No. 10 Civ. 6005(RWS), 2014 WL 1621480 (S.D.N.Y. Apr. 22, 2014)....... 16, 18

*Sokolow v. Palestine Liberation Org.*,
    No. 04 CIV. 397 GBD RLE, 2012 WL 3871380
    (S.D.N.Y. Sept. 6, 2012) ..........................................................................17, 23

*United States v. Treacy,*
    639 F.3d 32 (2d Cir. 2011) ............................................................ 16

*von Bulow by Auersperg v. von Bulow,*
    811 F.2d 136 (2d Cir. 1987) .......................................................... 16

## Statutes and Rules                          Page(s)

Fed. R. Civ. P. 45(d)(1) ................................................................... 23

Fed. R. Civ. P. 45(d)(2)(B)(i) ............................................................ 1

Fed. R. Civ. P. 45(f) .................................................................. 24, 25

S.D.N.Y. Local Rule 7.1(a)(2) ........................................................... 1

## INTRODUCTION AND BACKGROUND FACTS

Pursuant to Fed. R. Civ. P. 45(d)(2)(B)(i) and Local Rule 7.1(a)(2), Drummond Company, Inc. and Drummond Ltd. (collectively "Drummond") submit this memorandum of law in support of their motion to compel VICE Media, LLC ("VICE") to produce the unedited audio recordings of VICE's interviews of three individuals: Terrence P. Collingsworth, Jaime Blanco, and Juan Carlos Rojas.

As explained in greater detail herein, these non-privileged audio recordings can only be obtained from VICE and they likely contain information highly relevant to Drummond's federal RICO and defamation lawsuits that have been ongoing in front of Judge David R. Proctor in the Northern District of Alabama for a number of years. Both cases have been consolidated for discovery purposes and the underlying subpoena was issued in the context of those consolidated cases and served on VICE on July 2, 2021. Despite significant meet-and-confer efforts—through which Drummond narrowed its subpoena to one request for unedited audio recordings—VICE has refused to produce anything in response to Drummond's subpoena. Drummond now seeks this Court's intervention to compel VICE to respond.

### Drummond Company, Inc. and Drummond Ltd.

Drummond Company, Inc. is an Alabama corporation with its principal place of business in Birmingham, Alabama. During the time relevant to the Complaint in the underlying lawsuit, Drummond's subsidiary, Drummond Ltd., has operated a coal mine in Colombia, South America. Ex. 1 (Complaint) ¶ 9.

**Terry Collingsworth**

Since 2002, Mr. Collingsworth and his associates have filed multiple lawsuits against Drummond and its executives alleging that Drummond was complicit with a paramilitary group in Colombia called the Autodefensas Unidas de Colombia ("AUC"). None of these cases has met any success. The first case alleged that Drummond collaborated with the AUC to murder Colombian union leaders Valmore Locarno, Victor Orcasita, and Gustavo Soler. In July 2007, a jury returned a verdict in favor of Drummond and its executives, and the Eleventh Circuit affirmed on appeal. *Romero v. Drummond Co., Inc.*, 552 F.3d 1303 (11th Cir. 2008) ("*Romero*"). Ex. 1 (Complaint) ¶¶ 38-40.

Mr. Collingsworth filed a second case against Drummond in 2009, shortly after the *Romero* verdict was affirmed on appeal, again alleging that Drummond was responsible for the union leader murders. Not surprisingly, the district court dismissed the claims against Drummond and its executives, and that dismissal was affirmed by the Eleventh Circuit. *Baloco v. Drummond Company, Inc.*, 767 F.3d 1229 (11th Cir. 2014), *cert. denied*, 136 S. Ct. 410 (2015) ("*Baloco*"). Ex. 1 (Complaint) ¶ 60.

The third case, also filed in 2009, alleged that Drummond paid the AUC through an independent food services company owned by Jaime Blanco, and that the AUC murdered Colombian citizens living near a rail line that Drummond used in Colombia to transport coal from its mine to a port, where it is then shipped overseas to Drummond's customers. Following extensive discovery, United States District

Court Judge R. David Proctor granted complete summary judgment in favor of Drummond and its executives, and that ruling was also affirmed by the Eleventh Circuit. *Doe, et al. v. Drummond Company, Inc., et al.*, 782 F.3d 576 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016) ("*Balcero*").

The last case, which Mr. Collingsworth filed in 2013, is premised on virtually identical allegations as *Balcero* and was filed by a different group of Colombian plaintiffs. *See Marisol Melo Penaloza, et al. v. Drummond Company, Inc., et al.*, 2:13-cv-00393-RDP (N.D. Ala.) ("*Melo*"). With the exception of the Estate of Garry Neil Drummond, all defendants in that case have been dismissed. Judge Proctor has stayed *Melo* pending the outcome of the Court's resolution of numerous privilege issues in Drummond's defamation case (discussed below) against Mr. Collingsworth. Ex. 2 (June 15, 2021 *Melo* Order).

**Jaime Blanco**

Between 1996 and 2001, Blanco was an independent food services contractor for Drummond's Colombian mine, providing meals to the workers. Leading up to the murders of the three union leaders (Locarno, Orcasita, and Soler), workers at the Colombian mine were threatening to strike due to the poor quality of the food. After the murders, it was widely speculated that Blanco was behind the murders. Drummond terminated Blanco as a contractor following the murders. Ex. 1 (Complaint) ¶ 90.

Blanco was arrested in September 2010 in connection with the murders, and he provided testimony to the Colombian authorities. Blanco testified that he never

met an AUC paramilitary named Jhon Jairo Esquivel Cuadrado ("El Tigre") [1], that

he had no prior knowledge of the murders of the union leaders, and that he had no

knowledge of Drummond being involved with the deaths of the union leaders.  He

was also asked specifically about claims that his food services company was used to

funnel money to paramilitaries, and testified that this was "something that is

absolutely false and accounting-wise impossible.  It is what we call a numerical

reality." *Id.* at ¶ 91.

At the end of his testimony, Blanco informed the Colombian authorities that

money was being offered to paramilitaries to give false testimony for a civil case

against Drummond in the United States:

> I want to state before Mr. Prosecutor with all due respect that a lot of
> interests are moving with respect to this issue since the only objective of
> this moment is to link DRUMMOND to a civil proceeding so that a
> proceeding be reopened in the United States, the proceeding that had
> already been closed. It is merely a financial interest. It would be good
> that the Office of the Prosecutor would look into the labor unions, NGOs
> ["Non-Governmental Organization"] and a large amount of lawyers who

---

[1] In *Balcero*, Collingsworth alleged that Drummond paid the AUC through Blanco's food services company, and that Blanco delivered this money on a monthly basis to El Tigre.  Ex. 1 (Complaint) ¶ 99.  Drummond later discovered that Collingsworth and his former firm of Conrad & Scherer, LLP ("C&S") paid over $130,000 to El Tigre and another AUC paramilitary named Alcides Manuel Mattos Tabares ("Samario"), both of whom testified against Drummond in *Balcero*.  VICE's podcast contains audio clips of Samario's letters rogatory testimony in *Balcero*, which Samario gave before any of these payments were discovered.  Like their payments to Blanco discussed *infra* on pages 5-10, the Defendants' payments to El Tigre and Samario were funneled through Ivan Otero.  Those monthly payments began at least as early as February 2011 and continued through at least December 2015.  In an email discussing these payments, Collingsworth told his co-counsel that El Tigre and Samario would need to be paid "until we get the deps [depositions] in the can."  *See* Ex. 1 (Complaint) ¶¶ 78-89.  As Judge Proctor recently observed, "Rarely, will someone be so foolish or cavalier as to commit to writing direct evidence of a crime or fraud (although, in this case, that is exactly what Collingsworth did in his 'deps in the can' email)."  Ex. 5 (Proctor Mandamus Response) at p. 31.

In addition to serving as a conduit for witness payments and as criminal counsel for the witnesses that received those payments, Otero was also promised a contingency fee in *Balcero*.  Ex. 3 (Dec. 7, 2015 Crime-Fraud Op.) at 29.  Judge Proctor described the evidence linking Otero to the crimes of witness bribery, suborning perjury, and fraud on the court as "nothing short of staggering."  *Id.*

are offering money to these demobilized groups that are in precarious financial conditions so that they say what they want to hear or say.

*Id.* at ¶ 92.

A few months later, in February 2011, Collingsworth—who is a lawyer affiliated with unions and is the executive director of the NGO IRAdvocates—began meeting with Blanco in prison. Lorraine Leete of IRAdvocates was present for at least one meeting. In order to gain access to Blanco in prison, both Leete and Collingsworth misrepresented to Colombian authorities that they were "amigos" (friends) of Blanco. A Colombian criminal attorney named Ivan Otero was also involved in these meetings, and according to Blanco's testimony in *Balcero*, Otero began representing Blanco as his attorney. *Id.* at ¶ 93.

Collingsworth began ingratiating himself with Blanco, asking Blanco to provide testimony against Drummond while at the same time offering assistance with Collingsworth's "contacts with the people in Washington" (presumably the U.S. authorities). Collingsworth told Blanco that Drummond was trying to pin the union murders on him, and called Drummond their "mutual enemy." According to testimony by Collingsworth, at some point Blanco requested assistance with his criminal legal fees. The federal court in Alabama has since described this discussion of a "$100,000 criminal defense fee" as "troubling." *Id.* at ¶ 94.

Desiring to meet Blanco's request, Collingsworth first turned to Parker Waichman, LLP—who was at that point providing significant funding for Collingsworth's fraudulent lawsuits—asking for the money to pay to Blanco. Collingsworth informed Parker Waichman that if they did not provide assistance he

was concerned that Blanco would continue to testify, as he had already, that Drummond had no role in the union leader killings. One of the lawyers at Parker Waichman, LLP asked Collingsworth "If paying [Blanco's] legal fees is going to be disclosed at some point in his deposition (which I'm sure we can all agree it will be), would it be of any real value to our case if his credibility as a witness is significantly damaged as the payment will likely be viewed as a form of bribery?" Collingsworth responded: "As opposed to him saying Drummond had nothing at all to do with it?" Ex. 4 (Defamation Doc. 101-15). Collingsworth testified that Parker Waichman ultimately declined his request to provide money to Blanco. Ex. 1 (Complaint) ¶ 95.

So, Collingsworth turned to another option—Albert van Bilderbeek. Collingsworth met with Blanco in July 2011 and told him that C&S[2] would be unable to make direct payments to him, but he had a person named Albert Van Bilderbeek that would be willing to pay. Collingsworth admits that he facilitated these payments. The arrangement was set up for Van Bilderbeek to wire funds to Otero, who would then deliver them to Blanco. *Id.* at ¶ 96. Collingsworth has admitted under oath that Blanco would not sign a declaration against Drummond unless and until he was paid. *Id.* at ¶ 97.

In September 2011, Albert Van Bilderbeek sent $60,000 to Otero to be given to Blanco. On September 16, 2011, Collingsworth wrote to Ivan Otero to confirm his receipt of the funds, covertly stating: "Dear Ivan, By now you should have received 2

---

[2] Collingsworth was a partner at C&S until late 2015, when Collingsworth dissociated from C&S.

packages. Just to be clear, the one from the brothers [referring to the van Bilderbeeks] you know what that is." *Id.* at ¶ 98.[3]

Less than 30 days later, Blanco signed a declaration for Collingsworth falsely accusing Drummond of being complicit in the union leader killings, as well as providing regular payments to the AUC through Blanco's food services company. Blanco claimed that these regular payments were made by him directly to a Colombian paramilitary named Jhon Jairo Esquivel Cuadrado ("El Tigre") from mid-1997 through the time of El Tigre's capture in July 2000. This is irreconcilable with El Tigre's own testimony that the first time he ever met Blanco was in March 2000. *Id.* at ¶ 99.

In December 2011, Collingsworth facilitated another $25,000 payment from Van Bilderbeek to Blanco, via Otero. *Id.* at ¶ 100. On December 28, 2011 Collingsworth sent an email to Albert Van Bilderbeek stating: "Ivan says nothing has arrived and that we are on thin ice. Can you somehow check on this and send a confirmation? This is truly urgent." Ex. 3 (Dec. 7, 2015 Crime-Fraud Op.) at 24. Otero emailed Collingsworth the same day saying: "They tell me that what was pending from the brothers just arrived." *Id.*

In April and May 2012, Blanco gave his trial testimony in *Balcero* via the letters rogatory process. Drummond and its counsel traveled to Colombia, and Blanco was transferred by the authorities from prison to a Colombian courthouse to give this

---

[3] Collingsworth used the vague term "the brothers" to refer to Albert Van Bilderbeek and his brother, Hendrik Van Bilderbeek, in communications discussing witness payments. The Van Bilderbeek brothers own Llanos Oil, which has made the wild accusation that Drummond conspired with the Colombian government to steal oil and gas rights from Llanos Oil. Ex. 1 (Complaint) ¶ 17.

testimony. Otero appeared as counsel for Blanco. In addition to Collingsworth, Lorraine Leete appeared as counsel for the *Balcero* plaintiffs. On the date Blanco provided the first session of his trial testimony (April 19, 2012), Collingsworth handed Otero $10,000 in cash. Ex. 1 (Complaint) ¶ 101; Ex. 3 (Dec. 7, 2015 Crime-Fraud Op.) at 24.

In the months leading up to this testimony Drummond had inquired in the *Balcero* discovery process about anything of value offered or given to Blanco, and the federal district court in Alabama had ordered this information to be disclosed. Despite this, Collingsworth and his associates fraudulently concealed the payments, and Blanco's trial testimony was taken without Drummond knowing about the thousands of dollars he had been paid. Blanco testified falsely and evasively, selectively invoking his right against self-incrimination to avoid answering questions posed by Drummond's counsel. *Id.* at ¶ 102.

Collingsworth, however, intentionally elicited perjured testimony from Blanco, not only about the false allegations against Drummond, but the fact that Blanco had been paid to testify. Collingsworth questioned Blanco about any offers made to Blanco concerning his testimony:

> Q [Collingsworth]: Have you had any promises or benefits provided to you?

> A [Blanco]: No, no kind whatsoever.

Collingsworth and his team had spent time with Blanco preparing him for his testimony, and Collingsworth knew what the answer to the above question would be,

and knew that it would be false. At no point did Collingsworth or any member of his team correct Blanco's testimony for the record. *Id.* at ¶ 103.

Due to the fraudulent concealment of the payments, Drummond's counsel was unable to cross-examine Blanco regarding the tens of thousands of dollars he had already been paid, but did ask a general question about whether Collingsworth had offered any assistance to Blanco, and Blanco perjured himself again:

> Q: What -- strike that. Did you discuss anything with Terry about help that Terry or his contacts could provide to you in your case?
>
> A: It is my understanding that just like in Colombia it is prohibited to receive assistance, and I believe it is the same way in the United States. I've never talked about that subject with Mr. Terry. In the statement that I'm making today, it's a voluntary statement regarding knowledge that I have regarding the facts that are being investigated. The written declaration that I have provided to the Alabama court I have stated there that this is by my own free will in that I have not been subject to any type of pressure nor gifts of any kind. That's correct.

*Id.* at ¶ 104.

Collingsworth, Leete, and Otero (who are all alleged to be members of the RICO Enterprise[4]) were present for Blanco's testimony. All were directly involved in the payments to Blanco and knew his testimony was unequivocally false, but did nothing to correct the record. Instead, they submitted Blanco's false testimony to federal district court in Alabama in support of their fraudulent lawsuits and as part of their massive extortionate scheme. *Id.* at ¶ 105.

---

[4] "The RICO Enterprise" refers to the named Defendants and their co-conspirators identified in the Complaint. *See* Ex. 1 (Complaint) ¶ 1.

In July 2012, the RICO Enterprise made another $35,000 payment to Blanco. Collingsworth facilitated this bank wire from Albert Van Bilderbeek to Otero, which Otero then gave to Blanco. *Id.* at ¶ 106.

**Juan Carlos Rojas**

Rojas is another of Collingsworth's witnesses. In sworn interrogatory responses, C&S stated that "Juan Carlos Rojas was a witness or potential witness in the *Balcero* and/or *Baloco* cases. Conrad & Scherer understands that Rojas was on the bus carrying the Drummond union leaders who were murdered. It appears that, in or before August 2010, Rojas offered to provide information or testimony if his family could be protected." Ex. 6 (*Defamation* Doc. 468-3) at 10 of 21.

On August 11, 2008, Rojas signed a declaration for Collingsworth in which he claimed to have witnessed the murder of Valmore Locarno. Ex. 7 (CS_TC023811). Evidence uncovered in the Defamation case shows that, between March 2006 and November 2009, an individual named Juan Carlos Rojas received more than $10,000 via Western Union from a person named Jairo Hernandez in the Washington, D.C. metropolitan area. Ex. 8 (*Defamation* Doc. 468-4) at 18 of 243. Collingsworth and his NGO, IRAdvocates, are located in Washington, D.C. Ex. 1 (Complaint) ¶ 14. Between August and September 2011, an additional $6,000 was sent to Juan Carlos Rojas by an individual in Ft. Lauderdale, Florida, Ex. 8 (Defamation Doc. 468-4) at 18 of 243, which is where C&S is located. Ex. 1 (Complaint) ¶ 12. Notably, it is undisputed that the Defendants made other witness payments by sending money to Colombia via Western Union and MoneyGram. *Id.* at Appendix A (describing in

detail more than 60 payments made by the Defendants to another witness named Jairo Jesus Charris Castro by sending money from either Washington, D.C. or Ft. Lauderdale to Colombia via Western Union and MoneyGram).

In its interrogatory responses, C&S claims not to know the individuals that made these payments and equivocally states that it "is not aware of any payments being made to Rojas or his family." Ex. 6 (*Defamation* Doc. 468-3) at 10 of 21. In his separate interrogatory responses, Collingsworth similarly claimed that he "believes the factual responses [by C&S] related to [Juan Carlos Rojas] to be accurate and adopts those responses as his own." *Id.* at 19 of 21.

### Drummond's Defamation and RICO Cases

Between January and September 2011, Collingsworth wrote three letters—two to the Government of the Netherlands and one to Itochu Corporation, a company which was in negotiations to purchase an interest in Drummond's Colombian subsidiary—stating as "objective facts" that Drummond was complicit with the AUC in the murders of hundreds of Colombians, and urging the recipients of the letters to cease all business ties with Drummond. Drummond Company, Inc. filed a defamation suit against Collingsworth and C&S in October 2011 styled *Drummond Company, Inc. v. Terrence P. Collingsworth and Conrad & Scherer, LLP*, 2:11-cv-3695-RDP (N.D. Ala.) (the "Defamation case"). Ex. 1 (Complaint) ¶ 146.

In March 2015, after it was discovered in the Defamation case that every single Colombian witness that offered letters rogatory testimony against Drummond in *Balcero* had been paid by Mr. Collingsworth and the other members of the Enterprise,

Drummond Company, Inc. and Drummond Ltd. filed a federal RICO lawsuit against Defendants Terrence P. Collingsworth, his "non-profit" organization International Rights Advocates, his former law firm of C&S, C&S Managing Partner Bill Scherer, Ivan Otero, Francisco Ramirez, and Albert Van Bilderbeek. The Complaint includes federal RICO claims and state law claims, and it is fundamentally premised on the allegation that the Defendants secretly bribed witnesses in Colombia to falsely accuse Drummond of heinous crimes, and then used that false, paid-for testimony in fraudulent lawsuits and extrajudicial publicity campaigns in an effort to extort money from Drummond. *See generally* Ex. 1 (Complaint).

In September 2015, when the scope of Defendants' witness payments and their lies about those payments started to become clear, Judge Proctor held a three-day evidentiary hearing in the Defamation case on the crime-fraud exception. On December 7, 2015, Judge Proctor issued a 50-page memorandum opinion and found that the crime-fraud exception applied to pierce Collingsworth and C&S's privilege claims they were using to thwart discovery into their witness payments. Ex. 3 (Dec. 7, 2015 Crime-Fraud Op.).[5] Among other things, Judge Proctor held that

- "In the face of what is now indisputable evidence, it is clear, and Collingsworth admits, that he made 'security' payments to multiple (at least six) witnesses in South America as part of his prosecution of lawsuits against Drummond Coal Company." *Id.* at 1.

- "[B]y all indications, virtually every witness who testified against Drummond in *Balcero* was paid in some form or fashion." *Id.* at 37.

- In fraudulently concealing these witness payments, "Collingsworth repeatedly made knowingly false representations in pleadings,

---

[5] The Eleventh Circuit affirmed Judge Proctor's crime-fraud ruling. *Drummond Company, Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324 (11th Cir. 2018).

affidavits, correspondence, and open court. The extent of these misrepresentations rises far above the level of mere discovery violations to evidence that, if believed by the trier of fact, would establish some ongoing fraudulent violation." *Id.* at 17-18.

- "Here, the court has no hesitation in finding that there is (at least) probable cause to believe that Collingsworth, while prosecuting lawsuits on behalf of his firm, engaged in witness bribery and suborning perjury[.]" *Id.* at 26.

Judge Proctor recently reiterated many of these findings when he accepted the Eleventh Circuit's invitation to file a response to a petition for writ of mandamus filed by Mr. Collingsworth in the Defamation case. Ex. 5 (Proctor Mandamus Response). In that 34-page response, Judge Proctor stated that

- "When initially confronted with this information, Collingsworth lied to the court (and others) about the payments. … Collingsworth lied in interrogatory responses, in pleadings filed with the court, in declarations filed with the court, and directly to the court during hearings." *Id.* at 3-4.

- "Drummond contends that (1) witnesses who have now implicated Drummond officials in criminal behavior initially testified to Colombian authorities that those same Drummond officials were not involved with the paramilitaries, (2) but, after receiving payments from Collingsworth and the Firm, those witnesses flipped their testimony and implicated Drummond. The evidence presented at the crime-fraud hearing appears to lend support to that claim." *Id.* at 17.

- "Collingsworth secretly paid witnesses and then lied about it." *Id.* at 34.

The Defamation case is ongoing and the parties are still in the midst of a tedious process involving a Special Master and the *in camera* review of thousands of documents—over which C&S and/or Mr. Collingsworth have claimed privilege—for production pursuant to the crime-fraud exception. Judge Proctor consolidated the RICO and Defamation cases for purposes of discovery.

**VICE's Podcast**

In March 2021, VICE Media, LLC ("VICE") released a multipart podcast titled "The Crisis." https://www.vice.com/en/article/88nayv/podcast-coal-union-murder-colombia-us-the-crisis (last visited December 6, 2021).[6] According to VICE, the podcast is "an investigation into a deadly fight over labor and natural resources that ultimately led to the[] deaths" of union leaders who worked at Drummond's mine in Colombia. *Id.* As relevant here, the podcast includes audio excerpts of VICE's recorded interviews of Collingsworth, Blanco, and Rojas. Ex. 9 (VICE Podcast Transcript) at Chapter 1, pgs. 2-7, 13-16; Chapter 2, pgs. 2-3, 10-12; Epilogue, pgs. 2-4 (Rojas); *id.* at Chapter 1, pgs. 30-31; Chapter 2, pgs. 3-14; Chapter 5, pgs. 24-25 (Collingsworth); *id.* at Chapter 5, pgs. 7-16 (Blanco). In those interviews, these individuals discuss Drummond and the allegation that Drummond was complicit with Colombian paramilitaries and the murder of union leaders in Colombia. *See, e.g., id.* at Chapter 1, pgs. 15-16 (Rojas claiming to have seen armed paramilitaries in the cafeteria where Blanco served meals to Drummond's workers); Chapter 2, pgs. 11-15 (Collingsworth discussing witnesses and his allegations against Drummond); Chapter 5, pg. 12 (Blanco telling VICE that he "would overcharge Drummond and funnel money to the paramilitaries").

This miscellaneous proceeding arises out of a subpoena that Drummond issued to VICE after the release of its podcast. On its face, Drummond's subpoena sought, *inter alia*, all of VICE's communications with, and documents relating to,

---

[6] A transcript of VICE's podcast is attached as Exhibit 9.

Collingsworth and other members of his litigation team. Drummond's subpoena also sought the unedited audio recordings of all people interviewed by VICE as part of the production of its podcast. VICE raised several objections to Drummond's subpoena, with its primary objection being the journalists' qualified privilege.

Counsel for VICE and Drummond engaged in an extensive meet and confer process involving written correspondence and telephone calls. Exs. 10 & 11 (Meet and Confer Letters); Ex. 12 (Meet and Confer E-mail Chain). During that process, Drummond significantly narrowed the scope of its subpoena, culminating with an offer to VICE on November 1, 2021, to accept only the unedited recordings of the interviews of Messrs. Collingsworth, Adkins, Blanco, and Rojas in order to avoid litigation over the subpoena. VICE rejected Drummond's offer. Ex. 12 (Meet and Confer E-mail Chain).

Drummond now moves to compel VICE's compliance with Drummond's subpoena in one, narrow respect: production of the full, unedited audio recordings of the interviews of Messrs. Collingsworth, Blanco, and Rojas. As explained below, these nonconfidential recordings are directly relevant to multiple, significant issues in the underlying RICO case, and they are not reasonably available from other sources. *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 (2d Cir. 1999). Accordingly, they should be produced under settled law.[7]

---

[7] Drummond and VICE have agreed on a briefing schedule for this motion to compel, Ex. 12 (Meet and Confer Email Chain), which is set forth in Drummond's Notice of Motion filed contemporaneously herewith.

**LEGAL ARGUMENT**

**I.    THE LEGAL FRAMEWORK OF THE JOURNALISTS' QUALIFIED PRIVILEGE**

"The instant case is a federal question case by virtue of the RICO claim; and pendent state law claims arise in the case.  Accordingly, [ ] the federal law of privilege controls the question whether the privileges asserted by [VICE] should be recognized." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987). *See also Breaking Media, Inc. v. Jowers*, 91 Misc. 194 (KPF), 2021 WL 1299108, at *4 (S.D.N.Y. Apr. 7, 2021).

The Second Circuit recognizes "a qualified evidentiary privilege for information gathered in a journalistic investigation." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 (2d Cir. 2011).  "[W]hile nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought." *Gonzales*, 194 F.3d at 36.

VICE has not taken any steps to conceal Collingsworth, Blanco, or Rojas' identities.  To the contrary, VICE openly disclosed their names in its Podcast and aired multiple audio clips of their respective interviews.  These recordings are therefore "nonconfidential" under settled law. *United States v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011).  "Where, as here, the information comes from a nonconfidential source, the *Gonzales* test for nonconfidential information applies." *Schoolcraft v. City of New York*, No. 10 Civ. 6005(RWS), 2014 WL 1621480, at *2 (S.D.N.Y. Apr. 22, 2014).  To obtain nonconfidential information under this "less demanding" test,

Drummond must demonstrate that the recordings are "of likely relevance to a significant issue in the case" and "not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36.

Case law confirms that recordings and statements of nonconfidential sources are discoverable where the party issuing a subpoena satisfies the *Gonzales* test. For example, in *Sokolow v. Palestine Liberation Org.*, the plaintiffs subpoenaed the British Broadcasting Corporation ("the BBC") for the unedited interviews of two alleged terrorists living in the West Bank. No. 04 CIV. 397 GBD RLE, 2012 WL 3871380, at *1-2 (S.D.N.Y. Sept. 6, 2012). The BBC moved to quash the subpoena, citing the qualified journalist privilege. *Id.* at *2. The court denied the BBC's motion and ordered the production of the unedited recordings, explaining "the BBC has not asserted the outtakes to be confidential," and that "[t]he outtakes are of 'likely relevance' because the footage in question may contain information that links Fatah to Al–Aqsa," which was one of the issues in the underlying litigation. *Id.* at *3. The court also specifically stated that while it was "skeptical of a 'smoking gun' presenting itself in these outtakes, the standard for relevance to overcome the journalist privilege for non-confidential materials is low, and the outtakes meet this lower standard of 'likely relevance' to a significant issue in the case." *Id.*[8]

In *Gonzales v. National Broadcasting, Inc.*, NBC's Dateline program played "a few brief clips" of video it obtained from a traffic stop that was central to the plaintiff's

___

[8] *See also Estate of Klieman v. Palestinian Authority*, 293 F.R.D. 235, 240 (D.D. C. 2013) (ordering the BBC to produce interview recordings in response to a similar subpoena served on BBC by a different set of plaintiffs).

claims in the underlying litigation. 194 F.3d 29. The plaintiff—Gonzales—subpoenaed NBC for the full, unedited footage of the entire stop, and NBC refused to produce the footage, claiming the journalist privilege. In affirming the district court's order compelling NBC to produce the full recording, the Second Circuit found that outtakes from an NBC Dateline broadcast relating to traffic stops in Louisiana were discoverable because they would "assist the trier of fact in assessing" two important issues in the case and were not readily available from other sources. *Id.* at 36. *See also Schoolcraft*, 2014 WL 1621480, at **2 & 5-6 (holding that a written statement authored by the plaintiff and given to a journalist was not protected by the journalist privilege because the statement "concerns one of the central issues in Plaintiff's claims" and "is not reasonably obtainable from other sources").

## II. THE AUDIO RECORDINGS ARE DISCOVERABLE.

Drummond seeks only the full, unedited statements of three individuals specifically listed in Request No. 8—Terrence P. Collingsworth, Jaime Blanco, and Juan Carlos Rojas. As demonstrated below, Drummond satisfies both prongs of the *Gonzales* test for the production of this nonconfidential information.

### A. The recordings are not reasonably available for any other source.

During the meet and confer process, Drummond asked whether the recordings were in the possession of anyone other than VICE, and VICE expressly "confirmed … that they did not give copies of the recordings out." Ex. 10 (Meet and Confer email chain) at 11/4/2021 email. Accordingly, these recordings are "not reasonably available from other sources." *Gonzales*, 194 F.3d at 36.

**B. The recordings are of likely relevance to multiple, significant issues in this case.**

These three recordings are "of likely relevance to a significant issue in the case." *Gonzales*, 194 F.3d at 36.

   **i. The Defendants' have a stated goal and proven record of exploiting the media to further their fraudulent campaign, thereby damaging Drummond's business and reputation.**

One of the central allegations in the underlying RICO lawsuit is that the "Defendants have engaged in a multifaceted criminal campaign to exert pressure upon Drummond in an attempt to damage Drummond's reputation and business interests and obtain a fraudulent and extortionate financial windfall." Ex. 1 (Complaint) ¶ 2. The Complaint alleges that "the Enterprise has spread these false allegations throughout the world, ***spearheading media and public relations campaigns***, and collaborating with activist groups to spread their fraudulent message." *Id.* at ¶ 8 (emphasis added). *See also id.* at ¶¶ 153-170 (detailing the Defendants' "Extrajudicial Campaigns" involving advocacy groups and the media); *id.* at Appendix E (detailing 57 separate communications between Defendants and members of the media and authorities in furtherance of their extrajudicial campaigns).

As these allegations make clear, a "significant issue in this case" is the extent and content of the Enterprise's (and their witnesses') communications with media outlets like VICE that relate to Drummond. The Complaint alleges that those communications have severely damaged Drummond, and that Defendants leveraged

extrajudicial media campaigns as part of their scheme to extort money from Drummond. Drummond is the focus of the VICE podcast, and these three individuals—Messrs. Collingsworth, Blanco, and Rojas—make allegations that Drummond was complicit with the AUC. Ex. 9 (Podcast Transcript) at Chapter 1, pgs. 15-16 (Rojas claiming to have seen armed paramilitaries in the cafeteria where Blanco served meals to Drummond's workers); Chapter 2, pgs. 11-15 (Collingsworth discussing witnesses and his allegations against Drummond); Chapter 5, pg. 12 (Blanco telling VICE that he "would overcharge Drummond and funnel money to the paramilitaries"). Thus, these audio recordings are not just of "likely relevance," they are directly relevant to a significant issue in this case.

Although the allegations of the Complaint conclusively demonstrate the "likely relevance" of these recordings, it is worth noting that there is substantial evidentiary support for the allegation that the Defendants have used, and continue to use, the media to perpetuate their fraudulent scheme against Drummond. IRAdvocates' website openly admits to collaborating with the media as a part of its strategy, stating that "We also work jointly to build coalitions with local lawyers, activists, and journalists to communicate the realities of the global economy's impact on human rights to the world." https://www.internationalrightsadvocates.org/about-us (last visited Dec. 9, 2021). And documents produced by Collingsworth and IRAdvocates make clear that the Enterprise actively uses the media to spread their fraudulent message and damage Drummond. Ex. 13 (CS001083) (Collingsworth emailing Van Bilderbeek that he hopes to "do some press/political work" with him on his next visit);

Ex. 14 (IRA-004047) (Collingsworth sending a journalist a copy of the *Balcero* complaint and stating "I would be happy to help you with your story - we really need press and Drummond is getting away with murder."); Ex. 15 (CS001060) (Collingsworth telling Albert Van Bilderbeek that "collectively we are all very enthusiastic about getting as much press as possible" and Van Bilderbeek responding that he will "provide very good press coverage").

ii. **The interviewees' representations about the existence, scope, nature, and purpose of witness payments are directly relevant a critical issue in this case.**

Another significant issue in this case is the scope, extent, and purpose of the Defendants' payments to witnesses, including the $120,000 that Collingsworth arranged to be paid to Blanco by Albert Van Bilderbeek. The VICE podcast begrudgingly acknowledges these payments, stating that "Terry made payments to [ ] witnesses [ ], which complicates this story." Ex. 9 (Podcast Transcript) at Chapter 5, pg. 6. After briefly discussing the RICO Enterprise's witness payments, VICE states that "the whole story is a huge f***ing mess. There are so many different people involved, and their stories and alleged motivations are all over the place." *Id.* at pg. 25. Judge Proctor was more direct in what to make of Collingsworth's witness payments, as he "ha[d] no hesitation in finding that there is (at least) probable cause to believe that Collingsworth, while prosecuting lawsuits on behalf of his firm, engaged in witness bribery and suborning perjury" Ex. 3 (Dec. 7, 2015 Crime-Fraud Op.) at 26.

VICE's podcast plays short snippets of Collingsworth's explanation of these payments, with Collingsworth claiming that "it is a regular practice in the United States and in any country that has a developed justice system that if a witness and/or his family members are threatened by testifying that it is appropriate to provide them with some form of security assistance." Ex. 9 (VICE Podcast Transcript) at Chapter 5, pg. 22.[9] **Collingsworth told VICE that these witness payments—which he characterizes as "security assistance" to the family members of paramilitaries—were "*a necessary evil, if you will, in terms of facilitating the testimony to benefit my clients*."** *Id.* at pgs. 24-25 (emphasis added).

Notably, the payments that Collingsworth facilitated from Van Bilderbeek to Jaime Blanco undisputedly had nothing to do with "security." VICE acknowledges these payments, stating that "Jaime [Blanco] was also receiving payments from people working with Terry [Collingsworth]" *id.* at pg. 7, when Blanco began accusing Drummond of wrongdoing. To make these payments to Blanco, Collingsworth "teamed up with an unlikely ally: an oil company that had issues with Drummond in Colombia." *Id.* at pg. 24. That oil company was Llanos Oil, which is owned by Defendant Albert Van Bilderbeek. Ex. 1 (Complaint) ¶¶ 17, 90-107. Van Bilderbeek paid at least $120,000 to Jaime Blanco, and it is undisputed that Blanco would not sign a declaration against Drummond unless and until he was paid. *Id. See also* Ex.

---

[9] This is the same story Collingsworth and C&S offered to Judge Proctor at the crime-fraud hearing through the testimony of three "experts" on witness payments. After observing the testimony firsthand, Judge Proctor found that "none of these individuals analyzed the actual payments (and the context of those payments) which are at issue in this case," that two of them "knew nothing" about the payments at issue, and that the third offered the "troubling opinion" that it was acceptable to lie to the court and opposing parties about paying witnesses. Ex. 3 (Dec. 7, 2015 Crime-Fraud Op.) at 43-44 n.30, 31.

3 (Dec. 7, 2015 Crime-Fraud Op.) at 22-24. When asked about Van Bilderbeek and Blanco, Collingsworth told VICE that "he [Van Bilderbeek] basically decided that the enemy of my enemy is my friend and began working with us providing whatever support he could in terms of putting us in touch with witnesses." Ex. 9 (VICE Podcast Transcript) at Chapter 5, pg. 24. Although VICE's podcast states that "Jaime [Blanco] claims this [money] was for his legal fees," *id.*, the podcast does not include any portion of the recording of VICE's interview with Blanco in which these payments were apparently discussed.

The unedited audio recordings of these interviews include Collingsworth and Blanco's full statements about the scope, nature, and extent of the payments at issue, not just the snippets played by VICE. The recording of Rojas' interview may also include discussions with Rojas about the topic of witness payments. The recordings therefore have clear relevance to this additional issue.

### III. VICE'S UNDUE BURDEN OBJECTION IS MERITLESS IN LIGHT OF THE NARROW SCOPE OF THIS MOTION TO COMPEL.

VICE's letter of July 21, 2021 raised an objection based on undue burden under Fed. R. Civ. P. 45(d)(1). Ex. 11 (July 21, 2021 R. Strom Ltr.) at 2-3. While that objection was based on Drummond's subpoena as originally drafted, it has not been formally withdrawn despite Drummond's significant narrowing of the materials requested. Given that Drummond is only seeking production of recordings of three interviews, any continued objection based on "undue burden" is without merit. *See, e.g., Sokolow*, 2012 WL 3871380, at *4 (ordering the production of the outtakes of two interviews over the BBC's undue burden objection). The recordings Drummond seeks

are readily available to VICE, and they can be produced without any significant burden on VICE or its counsel.

## IV. DRUMMOND TIMELY ISSUED AND SERVED ITS SUBPOENA ON VICE.

VICE's letter of July 21, 2021 also claimed that Drummond's subpoena is "untimely because discovery in the [RICO] action was scheduled to be completed over a year ago." Ex. 11 (July 21, 2021 R. Strom Ltr.) at 3. As the Order cited by VICE in its letter reflects, Judge Proctor made clear that he would not set any "deadlines for discovery and other matters until the crime-fraud document review process … has been completed":

> This matter is before the court on the parties' Joint Motion for Entry of an Amended Scheduling Order. The court agrees that an amended scheduling order is needed in this case. However, as the court has previously noted, there is little point in setting deadlines for discovery and other matters until the crime-fraud document review process involving the Special Master has been completed. Therefore, the Motion for Entry of an Amended Scheduling Order is GRANTED IN PART. Within fourteen days of the completion of the document review process, the parties SHALL file a revised proposed amended scheduling order. An appropriate amended scheduling order will be entered at that time.

Ex. 16 (RICO Doc. 180 Text Order). The crime-fraud document review process is ongoing, and therefore there are no "deadlines for discovery and other matters" in the underlying RICO case. VICE's "timeliness" objection is therefore misplaced.

## V. ALTERNATIVELY, THIS MISCELLANEOUS PROCEEDING SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF ALABAMA.

Fed. R. Civ. P. 45(f) states that "[w]hen the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional

circumstances." Drummond raised a Rule 45(f) transfer with VICE, and VICE stated that it opposes such a transfer. Ex. 12 (Meet and Confer Email Chain) at 12/13/2021 Strom email. Regardless, exceptional circumstances exist which warrant the transfer of this miscellaneous proceeding to the Northern District of Alabama.

The instant RICO action emanates from more than a decade of related litigation involving the members of the RICO Enterprise and Drummond. Since 2009, United States District Court Judge R. David Proctor has overseen all of this litigation. It involves significant factual complexity and transcends international boundaries. Given that a primary issue in deciding the subpoena will be the "likely relevance" of the requested information to "a significant issue in the case," familiarity with multiple cases spanning more than a decade will be important to resolution of that question. Under these circumstances, a transfer is appropriate. *SBA Communications Corp. v. Fractus, S.A.*, 19 Misc. 130 (ER), 2019 WL 4879333, at *2 (S.D.N.Y. Oct. 3, 2019) (transferring a subpoena to the Eastern District of Texas where the underlying action was pending because that court "is best-positioned to address the subpoena given the nature of the dispute and the posture and complexity of the underlying action"). Indeed, multiple courts have already exercised their discretion under Rule 45(f) to transfer subpoenas emanating from this related litigation to Judge Proctor for disposition. Ex. 17 (Composite Exhibit of Rule 45(f) Transfer Orders).

## CONCLUSION

WHEREFORE, Drummond respectfully requests that VICE be compelled to produce the full, unedited audio recordings of the interviews of Terry Collingsworth, Jaime Blanco, and Juan Carlos Rojas. In the alternative, Drummond requests that this miscellaneous proceeding be transferred to the Northern District of Alabama pursuant to Fed. R. Civ. P. 45(f).

Respectfully submitted,

*s/ John Murphy*
John Murphy, Esq.
John Murphy & Associates, P.C.
171 Madison Ave., Suite 305
New York, NY 10016
T: (646) 862-2012
E: jmurphy@johnmurphylaw.com

*Attorneys for Petitioners Drummond Company, Inc. and Drummond Ltd.*

## Certificate of Service

I hereby certify that on December 15, 2021, I filed a copy of the foregoing using the Court's CM/ECF system, and further certify that I served a copy of the foregoing on the following:

Rachel Strom, Esq.
Davis Wright Tremaine LP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
T: (212) 402-4069
E: rachelstrom@dwt.com

*s/ John Murphy*
John Murphy
*Attorney for Petitioners*