UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **DRUMMOND COMPANY, INC., et al.,** } | |
| } | |
| **Petitioners,** } | |
| v. } | |
| } | Case No.: 2:22-mc-00231-RDP |
| **VICE MEDIA LLC,** } | |
| } | |
| **Respondent.** } | |
| } | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on the Motion to Compel Compliance with Subpoena filed by Petitioners Drummond Company, Inc. and Drummond Ltd. ("Drummond") against Respondent VICE Media LLC. (Doc. # 1). The Motion seeks production of the unedited audio recordings of VICE's interviews of three individuals: Terrence P. Collingsworth, Jaime Blanco, and Juan Carlos Rojas, conducted in connection with a March 2021 podcast titled "The Crisis." (*Id*. at 19). VICE's Podcast is an investigation into the 2001 murders of three union leaders who worked for Drummond in Colombia. (Doc. # 11 at 5). VICE's podcast contains outtakes of the recorded interviews of Collingsworth, Blanco, and Rojas. (Doc. # 3-9). The Motion has been fully briefed, and is ripe for decision. (Docs. # 11, 23).[1]

**I.   Background**

Since 2002, Collingsworth and his associates have filed multiple lawsuits against Drummond and its executives alleging that Drummond was complicit with a paramilitary group in

---

[1] In a footnote in its Opposition to the Motion, VICE requests that, to the extent Drummond raises new arguments in its reply, the court either strike any such arguments or permit VICE to file a sur-reply. The court has reviewed Drummond's Reply, and no sur-reply is necessary.

Colombia called the Autodefensas Unidas de Colombia ("AUC"). The first case alleged that Drummond collaborated with the AUC to murder Colombian union leaders Valmore Locarno, Victor Orcasita, and Gustavo Soler. A jury rejected those claims, and that decision was affirmed on appeal. *Romero v. Drummond Co., Inc.*, 552 F.3d 1303 (11th Cir. 2008). The second case again alleged that Drummond was responsible for the union leaders' murders. That case was dismissed, and the dismissal was affirmed on appeal. *Baloco v. Drummond Company, Inc.*, 767 F.3d 1229 (11th Cir. 2014), *cert. denied*, 136 S. Ct. 410 (2015). The third case alleged that Drummond paid the AUC through an independent food services company owned by Jaime Blanco. This court granted summary judgment in favor of Drummond and its executives in that case, a ruling that was also affirmed on appeal. *Doe, et al. v. Drummond Company, Inc., et al.*, 782 F.3d 576 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

Despite his lack of success in these cases, between January and September 2011, Collingsworth wrote three letters -- two to the Government of the Netherlands and one to Itochu Corporation, a company which was in negotiations to purchase an interest in Drummond's Colombian subsidiary -- stating as "objective facts" that Drummond was complicit with the AUC in the murders of hundreds of Colombians, and urging the recipients of the letters to cease all business ties with Drummond. (Case No. 2:11-cv-3695-RDP, Doc. # 1, ¶ 146). In October 2011, Drummond filed a defamation case against Collingsworth and his former law firm, Conrad & Scherer ("C&S"), related to these letters. (*Id.*, *generally*).

During discovery in the defamation case, it was revealed that a number of witnesses who provided testimony against Drummond in the underlying cases had been paid by Collingsworth and/or his associates. (Case No. 2:11-cv-3695-RDP, Doc. # 417 at 37). After learning of this, Drummond filed a RICO lawsuit against Collingsworth and others alleging that these defendants

bribed witnesses in Colombia to falsely accuse Drummond of crimes (including the murder of the union members), and then used that false, paid-for testimony in fraudulent lawsuits and extrajudicial publicity campaigns in an effort to extort money from Drummond. (Case No. 2:15-cv-00506-RDP, Doc. # 1).

Jaime Blanco was arrested in September 2010 in connection with the murders of the union members. He initially testified that he had no knowledge of Drummond being involved with the deaths. (Case No. 2:15-cv-00506-RDP, Doc. # 1, ¶ 91). However, shortly after receiving $60,000, which was facilitated by Collingsworth, Blanco signed a declaration for Collingsworth stating Drummond was complicit in the union leaders' killings. (*Id*. at ¶ 99). After receiving another $25,000 payment, again facilitated by Collingsworth, Blanco gave trial testimony against Drummond. In response to questioning by Drummond about the receipt of payments, Blanco selectively invoked his right against self-incrimination. (*Id*. at ¶ 102). Collingsworth, on the other hand, was able to elicit Blanco's testimony that he had not received any promises or benefits related to his testimony, despite the fact that Collingsworth had facilitated (by that time) the total payment of at least $85,000 to Blanco. (*Id*. at ¶ 103).

Rojas signed a declaration for Collingsworth in which he claimed to have witnessed the murder of one of the union members. (Doc. # 3-7). Although there is no *direct* evidence that Rojas was paid by Collingsworth, there is circumstantial evidence consistent with that. For example, in sworn interrogatory responses, C&S stated that, "in or before August 2010, Rojas offered to provide information or testimony if his family could be protected." (Doc. # 3-6 at 21). Perhaps relatedly, between March 2006 and November 2009, an individual named Juan Carlos Rojas received more than $10,000 via Western Union from a person in the Washington, D.C. metropolitan area, and an additional $6,000 was sent to a Juan Carlos Rojas by an individual in Ft.

3

Lauderdale, Florida. Another witness named Jairo Jesus Charris Castro was paid by Collingsworth and his associates via Western Union and MoneyGram from either Washington, D.C. or Ft. Lauderdale to Colombia. (Doc. # 3-2 at Appendix A).

VICE's Podcast recounts that, as VICE was wrapping up its reporting, Colombia's attorney general's office announced that it was pressing charges against Augusto Jiménez and José Miguel Linares, the former and current president of Drummond in Colombia. (Doc. # 11 at 5-6). These executives are being charged with financing and promoting the paramilitaries that killed the three Drummond union leaders. (*Id.*).

Drummond's subpoena to VICE initially sought a broader category of information relating to the podcast, but Drummond has since narrowed the scope of its subpoena to a request for the unedited audio recordings of the interviews of Collingsworth, Blanco, and Rojas. (Doc. # 2 at 19-20; Doc. # 11 at 15). VICE has only agreed to "provide an authenticated copy of the published Podcast" in response to the subpoena based primarily on the journalists' qualified privilege. (*Id.*; Doc. # 11 at 15).

## II.     Applicable Law

In the Second Circuit, where the subpoena at issue was served, there is a qualified privilege protecting journalists' investigative materials from disclosure that applies to nonconfidential, as well as to confidential, information. *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 35 (2d Cir. 1999). However, "while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought." *Gonzales*, 194 F.3d at 36. That is, "when [] confidentiality is not at stake, the privilege should be more easily overcome." *Id*.

4

"Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show that the materials at issue [1] are of likely relevance to a significant issue in the case, and [2] are not reasonably obtainable from other available sources." *Id*. "[T]he standard for relevance to overcome the journalist privilege for non-confidential materials is low[.]" *Sokolow v. Palestine Liberation Org.*, 2012 WL 3871380, at *3 (S.D.N.Y. Sept. 6, 2012). Moreover, "in collecting the information in question, the person must have acted in [] the role of the independent[2] press." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011) (emphasis in original).

### III.   Analysis

Collingsworth, Blanco and Rojas are all named in VICE's podcast, and portions of their recorded interviews are played during the podcast. Therefore, they are not confidential sources.

Drummond contends that the recorded interviews of Collingsworth, Blanco, and Rojas are (1) "of likely relevance to a significant issue in the [RICO] case", and (2) "not reasonably available from other sources." (Doc. # 2 at 23 (quoting *Gonzales*, 194 F.3d at 36)). VICE contends that the *Gonzales* test has not been met because (1) the unedited recordings of the Collingsworth, Blanco, and Rojas interviews are not relevant to the RICO case; (2) those recordings are cumulative of other evidence Drummond has already obtained; and (3) Drummond can obtain the "information" in the unedited interviews from other sources. (Doc. # 11 at 609).

---

[2] "This distinction is perhaps best understood through an illustrative example. Consider two persons, Smith and Jones, who separately undertake to investigate and write a book or article about a public figure in national politics. Smith undertakes to discover whatever she can through her investigations and to write a book that reflects whatever her investigations may show. Jones has been hired or commissioned by the public figure to write a book extolling his virtues and rebutting his critics. Smith unquestionably presents a stronger claim of entitlement to the press privilege (which is not to say the privilege might not be overcome, depending on the circumstances). Jones, who was commissioned to write a book promoting a particular point of view regardless of what her investigations may reveal, either possesses no privilege at all or, if she possesses the privilege, holds one that is weaker and more easily overcome." *Berlinger*, 629 F.3d at 308.

5

### A. The Unedited Recordings Are Likely Relevant to a Significant Issue in the Underlying Case

The RICO Complaint is premised on the allegation that Collingsworth and his co-defendants bribed witnesses in Colombia to falsely accuse Drummond of crimes (including the union members' murders), and then used that false, paid-for testimony in fraudulent lawsuits and extrajudicial publicity campaigns in an effort to extort money from Drummond. (Case No. 2:15-cv-00506-RDP, Doc. # 1 ("Defendants have engaged in a multifaceted criminal campaign to exert pressure upon Drummond in an attempt to damage Drummond's reputation and business interests and obtain a fraudulent and extortionate financial windfall." ¶ 2)). The RICO Complaint alleges that "the Enterprise has spread these false allegations throughout the world, spearheading media and public relations campaigns, and collaborating with activist groups to spread their fraudulent message." (*Id*. at ¶ 8).

The unedited recordings of the Collingsworth, Blanco, and Rojas interviews are clearly relevant to allegations of an extrajudicial campaign involving the media and the paid-for testimony in the underlying lawsuits. The podcast describes itself as "a story about one company from Alabama [Drummond] that opened up a coal mine in Colombia in the middle of a civil war. And we're going to tell you this decades-long saga about bribery and scandal and murder that followed." (Doc. # 3-9 at 10). And, at least coincidentally, Colombia's attorney general's office announced that it was pressing charges against the former and current president of Drummond in Colombia just as VICE was wrapping up its reporting. (Doc. # 11 at 5-6).

Notably, the RICO Complaint alleges an ongoing criminal enterprise. More specifically, the RICO Complaint alleges,

> The RICO Defendants engaged in a multifaceted and massive scheme to extort and defraud Drummond, *deceive the U.S. and Colombian judicial systems*, and corruptly influence and deceive the media and general public concerning

6

> Drummond's purported responsibility for the murders of scores of Colombian citizens by bribing witnesses for false testimony, spreading fraudulent and false statements regarding Drummond to the U.S. and international media, *and advocating for the criminal indictment of Drummond in Colombia and the U.S.*

(Case No. 2:15-cv-00506-RDP, Doc. # 1 at ¶ 178) (emphasis added). The court has no hesitation in concluding that the argument that the recordings do not meet the "low" standard of "likely relevant" because VICE is not named in the RICO Complaint, or because the evidence is cumulative, is entirely without merit. *See Sokolow*, 2012 WL 3871380 at *3.

To the contrary, the podcast, and the unedited recorded interviews conducted in connection with it, are likely relevant to the question of whether there was an ongoing RICO enterprise. Collingsworth is a defendant in the RICO case and Blanco and possibly Rojas are the allegedly-bribed witnesses who Drummond contends provided false testimony and statements in court proceedings. Therefore, the court (which is handling the RICO case), finds that the unedited recordings of the Collingsworth, Blanco, and Rojas interviews are unquestionably of likely relevance to a significant issue in the RICO case.

    **B.**    **The Unedited Recordings Are Not Reasonably Obtainable from Other Available Sources**

As noted above, the information sought here is possibly evidence of the alleged ongoing RICO enterprise. That is, the unedited interviews are potentially actual evidence of Collingsworth's efforts to "influence and deceive the media and general public concerning Drummond's purported responsibility for the murders." (*See* Case No. 2:15-cv-00506-RDP, Doc. # 1 at ¶ 178). The court is not aware of any other source for information reflecting interactions between the media (generally) and VICE (specifically), Collingsworth, and those who there is evidence were paid.

VICE asserts that Drummond cannot show that the information is not reasonably obtainable from other sources because Drummond has full access to Collingsworth's sworn

testimony and documents as he is a defendant in Drummond's RICO and defamation suits. (Doc. # 11 at 19). However, this court is painfully aware that "Collingsworth [has] repeatedly made knowingly false representations in pleadings, affidavits, correspondence, and open court" in the defamation case. (Case No. 2:11-cv-3695-RDP, Doc. # 417 at 17). Twenty false representations -- of which the court was aware in 2015 -- are set forth at pages 8 – 17 of the court's December 7, 2017 Crime-Fraud Memorandum Opinion and Order (*Id.*), which was affirmed on appeal. *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324 (11th Cir. 2018). The court is also aware that Blanco has significant credibility problems because his initial testimony and his later (post-payment) testimony regarding Drummond's involvement in the union members' murder are irreconcilable. *See, supra* at p. 3. Rojas also provided testimony in the underlying cases against Drummond and had, at a minimum, requested payments. Thus, comments Collingsworth, Blanco, and Rojas freely shared with the VICE reporters are not reasonably obtainable from other sources. Nor is the requested information cumulative of other evidence of payments to witnesses.

VICE further argues that "impeachment material is ordinarily not critical or necessary to the maintenance or defense of a claim[.]" *In re McCray, Richardson, Santana, Wise, and Salaam Litig.*, 928 F. Supp. 2d 748, 758 (S.D.N.Y. 2013). But, as discussed above, the recordings' relevance is not limited to impeachment. The cases before this court already involve potential witness bribery and suborning perjury. Therefore, the unedited recordings have a unique impeachment value here. *See United States v. Bingham*, 765 F. Supp. 954, 959 (N.D. Ill. 1991) ("Even if the defendants attempted to interview all of the government witnesses and the witnesses

cooperated with them, the defendants would not obtain the particular statements that may be useful for impeachment purposes at trial.").

In *United States v. King*, the subpoena at issue "request[ed] production of all unedited, unbroadcast videotapes, commonly known as 'outtakes,' of [a reporter's] interview of [] a Government witness in this case, as well as any notes made by [the reporter] during the interview." 194 F.R.D. 569, 571 (E.D. Va. 2000). The reporter and the news organization moved to quash the subpoena on the ground that the materials sought were subject to a qualified reportorial privilege. *King*, 194 F.R.D. at 571. The court determined that unedited, unbroadcast videotapes and a reporter's notes from her interview with an unindicted co-conspirator who was certain to be a government witness are relevant and admissible, because the witness' statements in the interview would be useful for impeachment. *Id*. at 573. Because of the potential witness bribery and suborning perjury issues in this case, any materials useful for impeachment are particularly relevant and unavailable. And, to reiterate, the interviews are not merely evidence of payments to witnesses; rather, they likely would shed light on whether there are ongoing attempts to "influence and deceive the media and general public concerning Drummond's purported responsibility for the murders." (*See* Case No. 2:15-cv-00506-RDP, Doc. # 1 at ¶ 178).

**IV.     Conclusion**

For the reasons explained above, the unedited audio recordings of VICE's interviews of Terrence P. Collingsworth, Jaime Blanco, and Juan Carlos Rojas are of likely relevance to a significant issue in the RICO case, and are not reasonably obtainable from other available sources. Therefore, Drummond's Motion to Compel Compliance with Subpoena (Doc. # 1) is **GRANTED**.

**On or before March 31, 2022**, VICE Media LLC **SHALL** produce to Drummond the unedited audio recordings of VICE's interviews of Collingsworth, Blanco, and Rojas.

    **DONE** and **ORDERED** this March 7, 2022.

                                             **R. DAVID PROCTOR**
                                             UNITED STATES DISTRICT JUDGE